Ms. Lindemann. Good morning, Your Honors. May it please the Court, Jessica Lindemann on behalf of the Defendant Appellant Lemurel Williams. Mr. Williams' trial in this case was bookended by errors that we submit warrant reversal and remand of his conviction. At the outset of the trial, you have a Batson issue where the prosecutor exercised two of its strikes against African-American prospective jurors. Mr. Williams also is an African-American individual. And then at the conclusion of the trial, we have significant issues related to jury coercion. I would like to start with the Batson issue and specifically the argument that the issue was waived by the failure to raise it prior to the jury being sworn. And we will concede that several circuits have adopted the sort of categorical rule that's proposed by the prosecution in this case. But I would submit to you that this is not the case to adopt such a categorical rule and, in fact, might be the case that would cause you to rethink or give you some pause about adopting such a rule. So what rule would you suggest that we adopt if we don't go the way of the other circuit? I think the formulation of the Ninth Circuit in the Contreras-Contreras case seems to me to be reasonable as soon as possible, preferably before the jury is sworn. I mean, I would certainly concede that to the extent you have the opportunity, the reasonable opportunity, to raise the issue before the jury is sworn, that would be a preferable course of action. Here, I don't think that defense counsel really had a reasonable opportunity, and I will tell you why. The process of jury selection in this case involved passing a list of jurors back and forth, starting with the government, who had six strikes. The defense had 10. So you go back and forth. The government has its final strike, and with that final strike, it strikes juror number 27, who's one of the jurors that's at issue here. So at that point, that's the point when you can observe some level of pattern, I mean, to the extent that you can observe a pattern with only four African-American jurors on the panel. But that's when the Batson issue is sort of joined, and almost immediately after that, they publish the panel of the jury that's been selected, and then they swear him in. So defense counsel really, on that cold list being passed back and forth, he doesn't have time to really absorb that strike, think about it in the context of Batson. And I think the Sixth Circuit's recent opinion in Tomlinson, although it does take the more categorical approach, does make clear it's very important that you have time to absorb and raise a Batson challenge. And so we would submit here defense counsel did that as soon as he reasonably could. Counsel, isn't it reasonable to expect defense counsel, any counsel in a federal trial, in essence, to have the spine to say to the judge, could you wait a minute while we think through the, we need to evaluate the strikes before you excuse the panel, and before you swear in the new jury? I mean, in most cases, there is no Batson challenge. But if somebody wants time, I would think the judge would have to give them at least some time to think. Right? I agree that would have been reasonable for defense counsel to do here. I will say that the district court was moving very quickly in this case because he was simultaneously conducting a civil jury trial. And so this was kind of an unusual circumstance in terms of, I think the judge really wanted to move things along. And was this exchange of notes back and forth? The judge wasn't present for that, right? Or was the exchange of strikes back and forth? Yes, it was happening while the judge was giving preliminary instructions to the jury. Okay. In the other case? No, in this case. So in this case, he's given preliminary instructions and the strikes are going back and forth. Yes. So all the jurors on the panel are getting the preliminary instructions. Correct. As the notes are going back and forth. Correct. This panel, or the final selection, is percentage-wise almost identical to the beniree coming into the court, right? Percentage-wise, it is representative. However, that's not really the question under Batson. Well, we can't draw a discriminatory intent from that, right? If it reflects the community of beniree that comes into the courtroom and we end up with basically that diverse face on a jury, I'm not saying you should end the inquiry. I'm just saying we can't draw anything from that, can we?  The prosecutor exercised, I think, a disproportionate number or percentage of his strikes against African-American members. So I think the ultimate composition of the jury is not really the question. It's whether he exercised a disproportionate number of his strikes and whether those strikes made sense. And here we would submit to you that they did not. By the same logic, didn't the defense exercise discriminatory strikes on the base against whites? That is, all defense strikes were against white jurors? Well, Your Honor, I would submit that that's not before the court. In terms of whether there's a prima facie case. I know you think that's moot, but we're dealing with such small numbers here. I mean, the defense isn't entitled to exercise strikes on a racial basis any more than the prosecution, right? It's not. I agree with that. So doesn't the same logic point to trouble on the defense side here? Well, perhaps if the government had raised that issue, it might have some merit. But that hasn't been raised by the government and is not before the court. So let me get back to this rule for you. So if it's not strictly, it has to be done before the panel is excused. It's more flexible, like you said, within a timely fashion. So a short fashion, whatever that is under those particular circumstances. From a practical standpoint, since that initial jury or those jurors were excused, the court would have to bring in other jurors, assuming a Batson challenge was sustained. I just want to know from a practical standpoint how it would work. It would, Your Honor. Because, of course, if it had been made before the jury was excused, then there could have been further inquiry, further questioning, and that kind of thing. Sure, Your Honor. That's correct. You would have had to declare a mistrial, select a new jury. Now, I will say none of the proceedings had been conducted yet, so that's less of a burden than you'd have, for example, if it was raised after trial. How many people were brought in for jury selection? That's a big deal, right? You say we're just going to declare the waste of all 40 people's time so far today, right? Well, Your Honor, I think the same circumstance could happen even under a categorical rule under some jury selection procedures. So, for example, the Tomlinson case. You had a situation where they were selecting sort of mini panels and dismissing the jurors that were not selected for those mini panels and then ultimately have the complete jury. In that case, it would have necessitated bringing in a new panel because of the way that jury selection had been conducted. Nothing wrong with that practice, per se, but because jury selection procedures vary so much from court to court, I think that the same result could happen even under a categorical rule. And would you have to necessarily declare a mistrial? Couldn't a judge also order an additional 20 jurors to show up for the next day? Let's assume, well, I guess it depends if you had it. If you won on the Batson, you'd have 12 in the box, theoretically. So you wouldn't need it. But let's say you won on one. There are two people subject to Batson. One defense gets the objection sustained. The other, the objection is not sustained. So you still need one juror in the box. You wouldn't need to bring an entire panel in the next day or later, would you? Could you just bring in a certain number, 15 jurors? Jeopardy attaches once the panel is sworn. Well, I'm assuming the panel would not be sworn. If the panel had not been sworn. I'm saying 11. One Batson gets sustained. The other Batson challenge doesn't. You've got 11 in the box. You obviously need another juror. The panel hasn't been sworn. In that circumstance, you don't need to bring in an entire new panel to fill that one seat. I'm just trying to get to what would be practical in terms of how it would work. Yes, that's correct, Your Honor. And you should spend some time on that last issue, the jury, the coercion. The jury coercion? Yes. And I see my time is almost up. So thank you for that. Moving to the issue related to jury coercion, first, the polling process. We have a juror saying no. Judge didn't hear her say no in the individual polling of the jury. And then he calls a sidebar. From speaking with defense counsel below, my understanding is that the judge just sort of said, I'm going to poll the jury again. He hadn't heard the no answer on the first go-round. And so decided to just conduct a whole new poll. So that wasn't an opportunity where defense counsel really had input into the course of action that was taken. And, again, goes through the entire jury panel, polls them a second time, highlights the numerical division a second time, decides, again, without consulting with counsel, to send them back for further deliberations. And I'd just like to highlight. Let me ask you this. Did counsel ask to, before he sent them back, are you saying there was no time to ask or counsel didn't, I mean, even, go ahead. Yes, Your Honor. I think my understanding, and I was not trial counsel, so I didn't actually observe what happened. But my understanding is that there was not time. And I'd like to point to the wording of the supplemental instruction that the court decided to give to the jury. And particularly the last line. So he told the jury to continue with deliberations until you have reached a unanimous verdict. Not attempt to reach a unanimous verdict. Not use your best efforts to reach a unanimous verdict. But continue with deliberations until you have reached a unanimous verdict. And not the silver instruction, which is the standard. Not the silver instruction. And, Your Honor, I'm not necessarily saying that it would have been required for him to give a silver instruction at that point. What I am saying is that this particular instruction and this wording was coercive under the Supreme Court's decision in Jenkins. Ms. Linden, we have to review this for plain error, though, right? Because there's no objection to the instruction. There's no objection to the instruction, Your Honor. And I see my time is up. If I could. You may continue. If I could answer that specifically. So this is a totality of the circumstances review of jury coercion, generally speaking. And I agree that no objection was made and generally it would be an abuse of discretion for a supplemental instruction. Where you have a number of different issues that lead to jury coercion, some of which were objected to and some of which were not, I have not found a case that's directly on point there under the totality of the circumstances. Now, I will say if plain error review does apply, at least to some of these issues, in Brassfield, the Supreme Court said, notwithstanding the fact that this issue was not raised, it involves the relations between the court and the jury, and we will go ahead and reverse on the coercion issue. So not at any point during this process was there a defense objection? You know, after the polling, he says go back. There's no discussion by defense. Are there any objections at all? When the note comes back that says we have a verdict now, there was a misunderstanding. Any discussion as to how the district court should proceed at that point? The trial counsel did move for a mistrial, yes. My answer was specific to the jury instruction, and I don't think he specifically lodged an objection to the wording of the jury instruction. But he did move for a mistrial, and he raised the jury coercion issue generally speaking. When exactly, remind me, was that objection or the motion for mistrial made? So after the court gave the jury instructions and immediately called for recess, ran to attend to the civil trial, and defense counsel told the prosecution at that point that he intended to move for a mistrial, and rather than try to call the court back from the other trial that it was proceeding over, they agreed that if the jury returned a verdict, again, that he could move for a mistrial at that point. So it was right at the beginning of when the jury had returned its verdict for the second time. The resumed deliberations. But in essence, the issue was first raised when the jury returned deliberations after the polling. Correct. Okay, thank you. And then when the judge hit the bench again, that's when defense counsel made the motion for mistrial. Correct. And was there any discussion at that point of defense counsel saying, how are we going to proceed now? Judge, you know, any suggestion that there be any questioning of the juror or anything? It was just assumed the verdict would be taken, so it was a motion for mistrial. I'm just trying to get clear what defense counsel asked for. Was there any other kind of relief other than the mistrial? There was the mistrial motion, and there is an issue as to whether defense counsel properly preserved an objection to the voir dire of the juror. He submitted an affidavit before the district court that says, hey, I stood, I attempted to be recognized to make this motion that you at least question this juror further. And the trial judge did not see him, did not give him the opportunity to make that motion. And so there was no specific objection at that point. Now, after the verdict came in, he again moved from it. So he stood up, but the district judge didn't notice him? Did he say anything? Did he say, Judge, could I have a sidebar? It's not reflected in the record, Your Honor. So I can't tell you. And in his affidavit, he basically says he stood up and attempted to be recognized. That's the gist of it. That's what you've got. Yeah. Okay. All right. But the record as we have it now is the judge returns, as Judge Williams said, to the bench, and he just announces that he has an objection. I mean, excuse me, moves for a mistrial. Correct. And that's really what the record is. And he again moved for a mistrial and asked for a chance to submit written motion on that point. And so his motion for new trial also was sort of a second motion. And then when he asked for the mistrial, did he lay out the reasons? I mean, exactly what was said? He said he had concerns about coercion of juror number one given the polling and the fast return of the verdict and her demeanor during the trial. He sort of laid out she hadn't wanted to handle the gun. He observed some frustration on the part of the jury, that sort of thing. So that's the gist of the motion. That was a summing up of concerns that occurred during the trial. Is that what you're saying, Ms. Lenderman? Well, that trial counsel believed Lent credence to the fact that she was a holdout juror. But he was able to lay out his argument as to why there was a problem with what had happened before. That is where she's polled. Well, no, I guess he later asked this question about did she understand the question, and she says, yes, I misunderstood the question. So I want to get exactly what he said on this jury, the juror one, on the mistrial. Exactly what was said. Do you know? I mean, I know that he said she was adamant twice in her refusal in open court to support the verdict. And I'm happy to come back with that on rebuttal, if Your Honor would like me to actually read it to you verbatim in the record. All right. Thank you. Thank you. Mr. Campbell? Good morning. May it please the Court, my name is Scott Campbell. I'm an assistant U.S. attorney and represent the United States in this matter. The United States asks that this Court affirm the judgment of the District Court for the reasons set forth in our brief. I'd like to briefly address some Batson issues and most specifically address why this Court should adopt the rule that we proposed to the District Court and the District Court applied in this case in holding that a Batson challenge that's not raised in a timely manner should be at least forfeited. And by timely manner, we believe that this Court should adopt a rule that a Batson challenge must be raised to avoid being forfeited before the jury is sworn. I then will address any questions that the Court would like me to address with regard to the juror polling and jury instruction issues relating to the continued deliberations. As to Batson, the United States asks that this Court do three things. First, hold that a Batson challenge is waived if not raised before, is forfeited rather, if not raised before the jury is empaneled. Second, we ask that this Court find that the District Court did not plainly err in holding that the defendant had failed to state a prima facie case, that the government had exercised its preemptory challenges in a racially discriminatory manner. And third, we ask that this Court conclude that the District Court did not plainly err in holding that the government offered a race-neutral explanation that was not pretextual, not a pretext for discrimination as to why it struck veneer members 16 and 27. My main argument, Your Honor, is simply this. That this Court should adopt a rule that to be timely, a Batson challenge must be raised before the jury is sworn. And why shouldn't we adopt a Ninth Circuit rule, which gives more flexibility? It says it has to be done within a reasonable period of time, but it doesn't have to be done immediately. For two reasons, Your Honor. First, this rule is fair. I think that the Ninth Circuit rule gives too much of an out because it says, if possible. And my case would be that as a factual matter, going to Judge Hamilton's point, as a factual matter, at least the way we pick juries in the Eastern District of Wisconsin, the defense lawyer has ample time, either lawyer has ample time before that jury is sworn in to see the composition of the jury. And that stems from one common-sense notion. No matter how a jury is picked, after that last strike is exercised, and here the government concedes that under the practice that Judge Statler uses, and in my experience most of the district judges use in the Eastern District, the government gets, of course, the customary six strikes, the defendant gets ten. And the government strikes first, the government strikes last. So I recognize that in this case, and in other cases coming out of Milwaukee that you will see, the government gets the last strike. But to Judge Hamilton's point, once the government exercises its last strike, the bailiff takes that piece of paper, brings it back to the defense table, and the defense lawyer gets to look at that. And one might say, well, gee, Scott, is that always the rule? Yes, it is. Why? Common sense. The court, through the bailiff, wants to make sure that both lawyers understand who is to be on that jury. So the defense lawyer gets to see that sheet of paper to make sure that when that jury is called up by the clerk, that what is on the prosecution's juror list and what's on the defense's juror list is consistent with the people sitting in that jury box. As Judge Hamilton pointed out in his question, if the defense lawyer needs more time after the government makes its last strike, it can ask for it. Judge, I need a timeout here. I just want to analyze the government strikes. And certainly any defense lawyer who is on his game and wants to look for a possible baton issue should be monitoring this as the strikes go on. In this case, I think the jury selection process took about 20 minutes before the jury list was published. So it's an ongoing monitoring. But certainly after that last strike, the defense lawyer has that opportunity to say, timeout. I want to look at this carefully and see if there's any pattern that might give rise to an inference of a discriminatory pattern of strikes. So this rule, Your Honor, is the Ninth Circuit rule gives an out if possible. My argument is, when is it not possible to raise this challenge before the jury is empaneled? My second argument, Judge Williams, would be simply this. If there's such a huge advantage to getting this done in a timely manner, that the court should not give it out. We're not asking for waiver here. We're simply asking for forfeiture. This can still be reviewed for plenary review. But I think it's fair to have a bright-line rule that applies to this forfeiture analysis because there are huge benefits to having a bright-line rule that this Batson challenge must be raised before the jury is empaneled. Number one, it would give effect to this Court's longstanding rule that a specific and timely objection must be raised to bring a Batson challenge. This Court has not yet ruled as to when a Batson challenge is timely in the trial court, but it has held that it must be raised in the trial court. This Court simply has not had the opportunity, as eight other circuits have, to address the question as to when it must be timely raised in the trial court. Let me just go back to one other thing. Juror 16 and Juror 27. Yes, Your Honor. The reasons when you were given an opportunity to brief that, and that submission was provided. Ex parte? Yes, Your Honor. And in camera? Yes, Your Honor. Is that a normal practice in Milwaukee, that the defense wouldn't, that it would be in camera in ex parte? You know, Judge, I don't think I made the right call on that. If I were to do that over, I'd do it under seal, but not in camera. You have to, I'm putting myself back in situation. Yeah, but why do you even need to do it under part? This arose. Under seal, but available to the defense counsel. Right. I think we had done some very quick research, and I saw that that was an option, and it seemed that it would be prudent at the beginning of trial so as not to reveal our trial strategy. But given that I filed that brief after trial, that no longer made sense. It's something that I had simply fronted with the court at the beginning and defense counsel and said, this is what I intended to do. But there were two or three reasons for it, Judge. Number one is that we didn't believe that the Batson challenge was preserved. Number two, we didn't believe that the Prima Fascia case had been made, and therefore we did not want to waive the Prima Fascia case or waive forfeiture or waiver by immediately going to our reason. So I didn't think we should have to give it at all. So you're saying in the normal instance when Batson is raised before the jury is sworn, any discussion you have or any response you have to defense counsel's motion on Batson would be at a sidebar or outside the presence of the juror, but defense counsel would know the reasons. Your Honor, I think upon reflection, it would have been more prudent to do it under seal but not in camera, particularly when I did it after trial. But I know that this came out of a particular context. The context was we thought and we still believe that we did not need to respond to give our reasons for the strike because there's no Prima Fascia challenge that was raised. That's an entirely different issue. This idea that this can be done ex parte is very troubling. Your Honor, I think upon reflection, I could have done it better, but it doesn't change the result in this case, and I have four reasons for that. I would like to argue mine. Well, so are you saying, though, but this is not a practice, this was just your idea on the spur of the moment? This was the first Batson challenge. This ex parte bothers me. It has to do with our supervisory responsibilities. I understand. I mean, our principal argument, Your Honor, is that we weren't required to give our reasons because no Prima Fascia case had been made and we thought had been waived, and we didn't want to waive waiver as happened in Hernandez and McMath where the prosecutor said, well, I'm going right to the merits, and then that moots the whole Prima Fascia case analysis. We believe that until the defense offered some Prima Fascia case of racially discriminatory intent and exercise of challenges, we shouldn't have to give our reasons. That's the way Batson works. So I understand that ex parte raises hackles, but here we weren't even obligated to give our reasons because no Prima Fascia case had been made. That's an entirely separate issue. Yeah, that's your sort of strategic call on how you go forward and understanding what the case law in Batson is, but I'm troubled by this ex parte part of it because defense counsel is obviously entitled to see everything. Right. It came up in the context of me saying to the judge, judge, we'd like to just brief the law on this because we don't think we have to give our reasons. Can I limit my brief to the law? And he said, no, give the facts too. And I said, I'm going to do that in camera under seal. This is before the trial, so as not to embarrass potential jurors and also so as not to reveal trial strategy. As I recall, no objection for the defense. The judge said, fine. And then after trial, I went ahead with that plan, which I had kind of hatched on the spur of the moment before trial. But again, I had asked the court to remember that this is a harmless error, error at all in the sense that the judge found that no Prima Fascia case had been made, number one. Number two, so therefore we weren't obligated to give our reasons at all because the first step of Batson had been satisfied. Number two, the defendant did not object to this until his post-trial briefing. Three, I don't think you can show any harm because in any event, the defendant now has the benefit of having seen our reasons and has still not offered any argument that our strikes were either outlandish or undermined by the facts. So I think this court can still not find plain error. So I really wasn't going to get into the merits, but this smile and this job of helping individuals instead of big institutions and traffic tickets, you know, on Juris 16, traffic tickets would predispose them to dislike police officers. Yes, Your Honor. Veneer of Person 16 had so many traffic tickets, including operations after a vacation, that he couldn't recall them. We had an individual voir dire on this reason to see whether he should be struck for cause, and that voir dire transcript is in the record on appeal. And those tickets have been issued by Milwaukee Police Department. Our principal officers and witnesses in this case were from Milwaukee Police Department. The case turned on their eyewitness testimony, and we were concerned that this juror of Veneer of Person 16, or potential jurors rather, would not be impartial because he'd had so many run-ins with MPD that, one, reflected lack of respect for the law, two, a possible lack of candor because he didn't respond to the law enforcement question, and three, we were concerned that he might have an extra grind with MPD because he had gotten so many tickets from them, still didn't have his driver's license, and still wasn't on a payment plan to even get to drive. The problem, if I could just for a moment, I understand that's your position. Yes, Your Honor. The judge didn't disagree with it. On appeal, however, now that the defense has had a chance to look at those reasons, the defense has called those into some question, suggesting that, for example, nobody else raised their hands about parking tickets when they were asked about law enforcement, et cetera. And what troubles me is that it's very nice to have a credibility finding from the district court on this, but if that is reached without the opportunity for critique, for rebuttal by the defense to say, no, you really shouldn't believe that, Judge, because of these other inconsistencies, it's hard to treat that as a result of a fair process. This is entirely separate from the waiver forfeiture issues, but I'm focusing on the ex parte process. Sure. I agree that if the court were called upon to reach that, if this court needs to reach the merits, that the better process would have been to have allowed, to have put those forward before the district court. However, if the court accepts our first argument, that this issue was forfeited, and I'd like to have a minute or two just to finish why this court should adopt that rule. If that court accepts that, then the court has to subject at least the prima facie case analysis, which is an essential step in the Batson process, also to the plain error review. And the fact is, the defendant, besides having sat in his hands until after the jury was sworn in and the other veneer person is dismissed, and deprived us of the opportunity to defend our challenge, our striking of rule veneer person 27 on a demeanor-based ground, because she was out of the building then, and we couldn't call her in and say, hey, did you give a big smile to the defendant? Setting that aside, Judge Hamilton, it's still relevant, and here's why. Where we raise a demeanor-based strike, and the defendant sits on his hands until that jury is gone, we would like to have the opportunity to, number one, bring that juror in so that we could create a record as to whether she did, in fact, in this case, smile at the defendant. We'd like to have the, because we could create that record, just call in veneer person 27 if our strike is challenged, and we could ask that veneer person, did you smile at the defendant? Why did you do so? Before the jury is sworn in. I've never heard of calling people back in to justify strikes. What if she says, no, I didn't? Well, we could still call our case agent. I mean, ordinarily, of course, these batching challenges are handled before the jury is sworn in, and if that person is still in the building, my point is that the court would have the opportunity to have a quality set of facts for this court of appeals to review. We could, for example, have a follow-up voir dire with a potentially struck juror because, of course, that strike isn't final yet. It's been challenged. The court would retain the possibility of reseating that juror. So we could have a follow-up voir dire with a potential juror, and if the court found the government had exercised that strike in a discriminatory manner, it'd order a reseating of the juror versus having to choose mistrial or go ahead with the trial and have the defendant reserve the chance to challenge the verdict after the fact. Mr. Campbell, I understand your forfeiture argument, and the court will have to decide what rule we adopt. And I appreciate that if there's no prima facie case, we don't get to the other issue. Yes, Your Honor. On the other issue, why isn't the jury just benire excused and rather than take the time to present it in camera, just present it as you stand there now before the judge in the presence of the defense counsel? I mean, there's no time lost. In fact, it could be done more quickly than retreating to in camera. Well, I think for one thing, the jury had been picked. We were ready to go with the trial, number one. So we didn't want a lengthy hearing on this, too. Well, but it must have cost time to go in camera, didn't it? When did you go in camera on this? On the jury selection issue? Yeah. We never did go in camera per se. I filed a five- It was after the trial. After the trial, I filed a six-page. Oh, it's all after the trial. Yeah. Right. We had argued right away out of the box that this was- We argued waiver, but I think the better view is forfeiture, obviously. Forfeiture clearly is the better argument than waiver. Right. We argued forfeiture. We argued at the time, waiver, it's too late. The jury's been sworn. But second, we said that no prima facie case had been made. Because remember, the only thing we had before us at this point, the jury's been picked, and the defense lawyer says, after the jury's gone, we come back to court, and the defense says, hey, Judge, I have some concerns. I can see- I understand. I can understand four of the government strikes of the three whites and one Asian American, but I can't understand the basis for the two strikes of African Americans. And at that point, we said, Judge, we've got a jury. It's too late. There's no prima facie case here. Mere speculation about why isn't enough. There's been no showing of a pattern. And in that regard, if I may, just say that statistically, as Judge Hamilton pointed out before- So, Mr. Campbell, give me- The jury's selected, then. Yes. And what happens right after the jury's selected? Is there a recess? There was a recess. I think we broke- as I recall, we broke for lunch, or at least some extended time. It's what, on the return from lunch that the issue was raised by the defense? Yes. The defense lawyer had raised it, I think, right around the lunch break with us, and we just said, sure, go ahead and raise it. No, I mean, when does he raise it with the judge? After lunch, as I recall. After the break, at least. Yes. And the judge is of the view that no prima facie case has been made? That's correct. And the judge was persuaded by the fact that there were two African Americans on the jury, number one. And as we pointed out in our brief, the percentage of African American jurors on the trial jury exceeded that in the veneer panel. And I did the math, and I believe it's 13.8% were on the 29-member veneer, 15.3% of the 13 jurors, including the alternate, were African Americans. So actually it was about, in percentage terms, about 1.5 percentage points higher, 10% more on the panel. So can I, and I know we're way over, but on this second issue, I want to find out about what the practice is, too, on this. Thank you. Where the judge, is it typical that a judge doesn't turn to counsel when something like this happened with juror one and say, how do you think I should proceed, counsel? I mean, because I'm troubled by this issue with juror number one. Okay, and, Your Honor, is it the jury instruction issue or is it the continuation of the polling? Yeah, the jury instruction and the argument that it was coercion in the way that it played out. Okay. Well, as to the continuation of the polling, if you'd like me to address the issues in turn, I would, but it will take me about three minutes. I'm in your lunch hour now, so if you want me to focus on one. Don't worry about our lunch hour. Just answer Judge Williams' question. All right. I know. More important than lunch. Well, first, I asked you to go back to the time. I understand the judge didn't hear it the first time. That's right. Because typically what will happen if the juror says, no, that's not my verdict, that stops the show. It stops the show, and even at the point when it was brought to him, no, it was not the verdict. Usually there's a sidebar and there's some discussion about how should we proceed when we get that kind of answer, and then there's usually both defense counsel and prosecution have input on what the next step is. That did happen, and I'll lay it out for you, Your Honor. I was trial counsel. And the first thing that happened is the jury came back with a verdict. We thought we had a unanimous verdict. The judge asked for a general polling. All the jurors said it was their verdict. The defense asked for individual polling. Juror number one said no. All the rest said yes. The judge didn't hear it, quite obviously, because he was about to dismiss the jury. We looked back at the defense table and thought, we have to have a sidebar. So we nodded our heads. We immediately asked for a sidebar. Judge, we advised the judge a sidebar. Juror number one said no. And the defense said, Your Honor, I'd ask for a re-polling, okay? Either that or the judge did sua sponte, one of the two. But I believe the defendant asked for a second polling. There was a second polling. You brought it to the attention? The defense lawyer and the prosecution both wanted to raise, but I believe that Mr. Wilmoth was the person who actually raised, who actually spoke with the judge. And as I recall, he asked for a second polling. But he did not at the time say, oh, and by the way, if juror number one says no again, stop then. He didn't say that. And that's why we've argued that this should be reviewed on a forfeiture analysis. So the judge continued with the polling. And at that point, the juror number one said no again. The rest said yes. And the judge then issued instruction that appellate counsel just read to you previously. He instructed the jury to continue reaching until it reached a unanimous verdict. But there was no discussion with counsel before he gave that instruction? No. And no request to discuss what he was going to say? That's right. But that said, Your Honor, we would contend that the continuation of the polling was not inherently coercive. That is that it was not a situation that in itself is a parasitic matter. No, I've moved on to the instruction now. Okay. Ask the instruction. Yeah. He doesn't turn to counsel and say, you know, how do you think I should proceed on this? No. No, he didn't. I think he just followed the Rule 31 dictate that at that point he could declare a mistrial or instruct the jury to continue deliberating. And he did that. He did not give a silver instruction, but I point out three or four things about this. Did anybody ask for a mistrial at that point? At that point, I don't believe any mistrial was requested. Tom Wilmoth moved for mistrial about an hour and a half later. The judge had then, after the judge said keep deliberating, he then reconvened a civil trial, and we went our merry way. And I think Mr. Wilmoth said, you know, I'm going to move for a mistrial. And we waited in our office, and we were reconvened about an hour, hour and 20 minutes later. At that point, Mr. Wilmoth made a move for mistrial, but by that time the judge already knew that the jury had come back with a verdict because the judge had the benefit of having received a note from the jury to the effect that we misunderstood the question. We have a unanimous verdict. Okay, so once that happened and everybody comes back, everybody's back on the record, that's when Mr. Wilmoth moves for mistrial. Yes. And then does he also say when that is denied, because that was obviously denied, is there any discussion of how things should proceed from there? That is to determine, you know, when he gets a note that says somebody misunderstood, is there any discussion about perhaps pulling in camera the juror? No. Or anything like that? The first time we heard about that was, I believe, in his post-trial motion where he indicated that he hadn't had the opportunity to raise that, but the district court did not find that obviously persuasive. The district court thought that the defense counsel would have had time, and I think he would have had time. I mean, it took several minutes for this whole process to go down. I believe he could have objected. I would like to just distinguish this case briefly from a case that this court considered recently, and I know Your Honor wrote the opinion on behalf of the court, and that was the Blitch case. I believe this case is distinguishable from Blitch, if I may draw that distinction with just another minute or so. One minute is the time you have to just. . . I think I'm negative five right now, Your Honor. Sorry. But I think this is different from Blitch because, as the court might recall, in Blitch, the jury had asked for permission to leave on a Friday afternoon at 3.30, and when the court said keep deliberating, I believe that came down at about 3.20 and could have given the jury the impression that they had to come back with a verdict by 3.30 if they wanted to leave on time. It's likewise distinguished from Cheney, the case that this court decided in the 70s, I think like 74, where at about midnight the judge said, hey, if you don't have a unanimous verdict soon, we're going to reconvene at 9.30, and the jury might have gotten the impression they had to deliberate all night. That was not the case here. They'd just been given a sobering instruction only three hours earlier, easy trial, short trial, and they'd only been out for about an hour. So for all these reasons, Your Honors, I apologize that I created an issue by submitting that document in camera, but I'd submit that when it comes to Batson, it's a harmless error because no prima facie case was made and the issue was forfeited. Thank you for your time. Thank you, Mr. Campbell. Ms. Lindeman, your time has expired, but you may have an additional three minutes. I appreciate the additional time, and I note that I had promised Judge Williams that I would find specifically where the motion for mistrial was made, and the record, that's at app 41 through 43. And Mr. Wilmoth, defense counsel below, says juror number two, which was an error. He meant juror number one, and it's sick in the record. The juror in question, I noted during the trial a demeanor that I could best describe as somewhat detached and recall that she would have been the lone juror who declined the handling of the firearm during the course of the trial, the actual physical firearm that the jury published to the jury, and wanted them to feel the weight as it related issues germane to the trial. It is this juror when polled two times indicated the guilty verdict returned by the jury of 12 as signed by the foreperson. I haven't seen the verdict, but I assume it is in proper form, was not her final verdict. Now looking at the advisory committee notes to 31D, and I will tell you all with candor, judges, this is a first for me, so I'm educating myself since this happened, indicate the purpose of individual polling is to determine with certainty that each of the jurors approve of the verdict as returned, that no one has been coerced or induced to sign a verdict to which he or she does not fully assent. You know how the verdict got signed by the foreperson again, assuming in proper form under these circumstances, I think is a mystery to everybody. I mean, there's various speculation that could range from juror number two simply changed her mind as she hit the courtroom, conducted some type of sit-in and deliberations and refused to participate, just as the jury considered their verdict unanimous. Juror number one was simply ignored by the balance of the jurors and the executing foreperson, and I would submit maybe there are several other additional scenarios. Regardless of what happened, juror number one's demeanor suggested when we were polling that she was adamant in her refusal in open court to support the guilty verdict, and I noted some but not all. The balance of the jurors appeared, by their demeanor, frustrated with the process. One juror on the second go-around currently responding yeah when asked a second time about a verdict. Yet another juror softly indicating yes during the second go-around. Clearly, Judge, I simply under these circumstances have a concern about coercion on the part of some of the jurors towards or upon juror number one, not even, Judge, anticipating the second verdict will be guilty after less than 10 minutes of deliberation, perhaps suggesting coercion. So he did also raise the timing of the return of the verdict in support of his motion for mistrial. And he didn't ask that she be individually voideared. That is outside the presence of the other jurors. Correct. Not in that motion. That was only an issue that he raised by affidavit after the fact, saying, hey, I'd stood to be recognized and didn't have the opportunity to raise this, but I intended to. So just in terms of the timing, I wanted to make sure we were clear about how the Batson challenge was raised because I think there might have been some confusion about what exactly happened at the district court level. So it was raised immediately after the court recessed following the jury being sworn. And the court said, I think this is a nonstarter because two African-Americans have been impaneled on the jury. Now, the jury is sworn, and Mr. Campbell said they went to lunch, and then this came up. Are you suggesting that's not an accurate description, that the jury was sworn and a dialogue ensued? Is that what you're saying? That's not what I'm saying. Thank you for the clarification. What I'm saying is the jury is sworn. They recessed. Mr. Wilmoth immediately brought the court's attention to the fact that he had an issue he wanted to raise with respect to after recess. Before lunch or after lunch? Before lunch or after lunch, does Wilmoth make his record? He makes his record after the recess, after lunch, but he does bring it to the court's attention immediately after the court calls for recess. So the court's not in session. He, meaning defense lawyer Ms. Lindeman, says that he will speak to the issue after lunch? Correct. Is that what the record shows? Correct. It's in the district court's opinion, he says, this was immediately brought to the attention after the recess. So after court lets out in the morning session. So there's no court reporter taking that? No. Correct. So it's a little bit procedurally complicated how this was done. So the court says this is a non-starter because two African-American jurors were impaneled. So at that point, in effect, the judge has made a finding that there's no prima facie case. He doesn't say it as such. Well, what's a non-starter to you, Ms. Lindeman? I mean, one could draw that conclusion. He does not use that language. Is that a fair reading, I guess? I don't think he analyzed the issue enough to conclude that there was a prima facie case. You're certainly entitled to argue that it was too summary, but it does seem to me that he is making that conclusion. Now, if you say it's summary, that's your interpretation. Of course, he presided over the selection, too, right? He did. So, I mean, he's attentive, one would assume, as a district judge should if he's presiding or she's presiding over the jury selection. Well, I think had he been intending to conclude that there was not a prima facie case made, he wouldn't have required written submissions to be made later. He would have just said, this is a non-starter. I don't think you've stated a prima facie case and move along. So I don't know that it's fair to say that just his summary statement, which I think, frankly, is an erroneous statement of law, was a determination one way or another on the prima facie case. And he actually says in his opinion that he thinks it's a close call, whether the prima facie case has been made. And so that, to me, is inconsistent with his earlier statement that this is a non-starter if he was intending to conclude that no prima facie case had been made at that point. So if I could just finish at least the summary of the proceedings just to clarify the record. So the government says nothing at that point. The court moves on to trial proceedings, calls in the jury. And my understanding is it's only before closing argument that this colloquy about, well, the government needs to make a written submission on the Batson challenge occurs. And so that didn't happen until basically after trial. And so the ex parte submission was not something that came up at the beginning of trial is my point on that. And so to summarize, we would ask that Mr. Williams' conviction be vacated and this case remanded for a new trial, unless the panel has any further questions. Apparently not. Thank you, Ms. Lindeman, and thank you, Mr. Campbell. Ms. Lindeman, you accepted this appointment, and you have the additional thanks of the court for ably representing Mr. Williams. All right, the case is taken under advisement, and the court will stand in recess.